UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AIMEE DEREZIC**, *et al.*,

    **Plaintiffs,**

    v.                                          Case No. 2:14-cv-51
                                                    JUDGE SMITH
                                                    Magistrate Judge King

**OHIO DEPARTMENT OF EDUCATION**, *et al.*,

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment filed by Defendant Dr. Richard A. Ross ("Ross") and Plaintiffs Birks, Coleman, Cuturic, Dautovic, Derezic, Flaisman, Geiger-Dugandzic, Grubach, Hill, Kilroy, Loscei, Mallory, Nosse, Pelima, Pesek, Quirarte, Moquemore, Rossman, and Zagar ("Plaintiffs") (Docs. 31, 30). The issues before the Court are fully briefed and ripe for review. For the reasons that follow, Ross's Motion for Summary Judgment is **GRANTED** and Plaintiffs' is **DENIED**.

            **I.**      **FACTUAL BACKGROUND**

The underlying facts of this case are not in dispute and were set forth in detail in the Court's previous Opinion and Order Granting Defendant Ohio Department of Education's Motion to Dismiss. (*See* Doc. 23). For ease-of-reference purposes, though, the Court will again present the facts pertinent to the pending motions below.

*The Educational Choice Scholarship Pilot Program*

Ohio's Educational Choice Scholarship Pilot Program was established by Ohio Revised Code Section 3310.02. *See* Ohio Rev. Code § 3310.02(A). The program essentially allows

students who attend or are assigned to attend "EdChoice eligible" public schools to apply for a "scholarship" which can be used to cover the student's tuition at an alternate private school of their choosing. (*See generally* Doc. 15, Ex. S, EdChoice Scholarship Program Manual). The Ohio Department of Education ("ODE") determines which schools are "EdChoice eligible" by considering a host of factors such as whether the school has a low performance index score or has been on Academic Emergency or Academic Watch in recent years. (*See id*. at 4; Doc. 15, Ex. 1, Designated Schools List). To receive an EdChoice scholarship, parents of students assigned to EdChoice-eligible schools submit an application to the ODE in conformance with the rules and regulations set forth in Ohio Administrative Code § 3301-11-05. The ODE then reviews the submitted applications and sends the applicants written notice of its final decision. *See* Ohio Admin. Code § 3301-11-07(C). Students already deemed eligible for the program (i.e., students who are seeking a renewal of their previous year's scholarship as opposed to first-time applicants) are given utmost preference in the awards process and are presumed to qualify for a scholarship again, absent certain intervening circumstances. *See* Ohio Admin. Code § 3301-11-07(A)(1); Ohio Admin. Code § 3301-11-04(C).

      The ODE has the power to terminate a student's EdChoice scholarship during the school year for which it was awarded if (1) the student's scholarship application "contained false information that, had it been correct, would have caused the scholarship recipient to be ineligible for the program" or (2) the student fails to timely enroll in another school after being withdrawn or expelled from the chartered nonpublic school in which the student was first enrolled. *See* Ohio Admin. Code § 3301-11-09(A). The ODE is required to notify a student of his or her termination from the program in writing. Ohio Admin. Code § 3301-11-09(D). Denied or terminated applicants may request the ODE to reconsider its decision by filing a written request

for reconsideration with the ODE and submitting any documentation or evidence they feel supports their position.  *See* Ohio Admin. Code § 3301-11-14.  After reviewing the written submission and additional evidence, the ODE renders its final decision.  *Id*.

*The Parties & the Reorganization of the Euclid School District*

Defendant Richard Ross is being sued in his official capacity as the ODE's Superintendent of Public Instruction.[1]  The Superintendent of Public Instruction is tasked with overseeing and administrating various educational matters and functions, including the Educational Choice Scholarship Pilot Program.  *See* Ohio Rev. Code § 3301.11.

Plaintiffs are the parents of minor children enrolled at various private schools in Euclid, Ohio.  Plaintiffs have self-designated themselves into two camps: the "Derezic Plaintiffs" (Derezic, Pesek, Roquemore, Hargrove, Hill, Birks-Chapman, Pelima, Coleman, and Grubach) and the "Nosse Plaintiffs" (Nosse, Quirarte, Locsei, Flaisman, Dugandzic, Cuturic, Kilroy, Zagar, Vuraich, and Dautovic).

The Derezic Plaintiffs all submitted applications for EdChoice scholarships for the 2012-2013 school year.  (Doc. 15, Am. Compl. at ¶ 41).  At the time they submitted their applications, their children were assigned to attend an EdChoice-eligible elementary school in Euclid, Ohio. (*Id*. at ¶ 43; Doc. 15, Ex. A, Eligible School List).  The ODE initially approved the Derezic Plaintiffs' applications and sent a written notice to each informing them that they would be granted an EdChoice scholarship for the 2012-2013 school year.  (*See* Am. Compl. at ¶ 46; Doc. 15, Ex. I, Award Letter).  However, after the scholarships had been approved and accepted, Euclid informed the ODE that the district had been reorganized and that the Derezic Plaintiffs were no longer assigned to attend a school that was EdChoice eligible. (*See* Doc. 15, Ex. C, E-

---

[1] For purposes of this Opinion, the Court's reference to "the ODE" encompasses Defendant Ross acting in his official capacity.

3

Mail Correspondence). Upon reviewing this information, the ODE determined Plaintiffs were no longer eligible for the program and notified them that their scholarships had been awarded in error. (*See, e.g.*, Doc. 15, Ex. J, Termination Letter). But, because of the confusion and late notice, the ODE allowed the Derezic Plaintiffs to keep their EdChoice scholarships for the 2012-2013 school year; the Derezic Plaintiffs were expressly informed, though, that because of the reorganization and their consequent ineligibility, the scholarships would not be renewed. (*See id.*).

The Nosse Plaintiffs all submitted applications for EdChoice scholarships for the 2012-2013 school year based on a similar belief that their children were assigned to attend one of Euclid's EdChoice-eligible elementary schools. (Am. Compl. at ¶ 87). However, unlike the Derezic Plaintiffs, the Nosse children were never technically assigned to an EdChoice-eligible school. (*See id.* at ¶ 88; Doc. 15, Ex. A, Eligible Schools List). As such, the Nosse Plaintiffs' applications were denied from the start: each Nosse Plaintiff received a denial letter informing them that the school to which their son or daughter had been assigned was not an EdChoice-eligible school. (Doc. 15, Ex. P, Denial Letter). But again, in light of the problems caused by Euclid's confusing redistricting plan, the ODE awarded the Nosse Plaintiffs a one-year non-renewable scholarship for the 2012-2013 school year. (*See id.*). The letter notifying the Nosse Plaintiffs of their award made it expressly clear that, absent a change in circumstances, they would not be eligible to receive an EdChoice scholarship the following year. (*Id.*).

Both the Derezic and the Nosse Plaintiffs requested the ODE to reconsider its denial/termination decision pursuant to the reconsideration procedures outlined in Ohio Administrative Code § 3301-11-14, but were unsuccessful. (*See* Am. Compl. at ¶¶ 54-55, 93; *see also, e.g.*, Doc. 15, Ex. Q, Reconsid. Req.; Doc. 15, Ex. R, Denial Letter). Despite the

4

ODE's decision, Plaintiffs accepted the EdChoice scholarships that they were awarded for the 2012-2013 school year and enrolled their children in private school. At the end of the school year, Plaintiffs submitted renewal applications, which the ODE denied. (*See id*. at ¶¶ 59-60, 96-97). Plaintiffs requested the ODE to reconsider its decision. (*Id*. at ¶¶ 61, 98; Doc. 15, Ex. T, ODE Correspondence). Upon reconsideration and without an oral hearing, the ODE again denied Plaintiffs' renewal applications, finding that the schools to which their children were assigned were not EdChoice-eligible. (*Id*. at ¶¶ 62, 99).

*The Current Action*

Plaintiffs filed this suit against the ODE and Ross in his official capacity as the ODE's Superintendent of Public Instruction. Plaintiffs subsequently filed an Amended Complaint (Doc. 15), which presently controls this action. In their Amended Complaint, Plaintiffs alleged the ODE and Ross violated their constitutional due process rights by depriving them of their EdChoice scholarships "without a meaningful opportunity to challenge the denial, and without sufficient due process protections to prevent errors." (*Id*. at ¶ 103). Plaintiffs also alleged that the termination of their EdChoice scholarships was in direct contravention of Ohio Revised Code Section 3310.03(E). (*Id*. at ¶ 117). In a previous Order and Opinion, the Court dismissed all claims against the ODE on jurisdictional grounds. (*See generally* Doc. 23, Order). It also dismissed Plaintiffs' state law-based declaratory judgment action against Ross. (*See id*.). Thus, the only cause of action that remains pending is Plaintiffs' due process claim against Ross in his official capacity. Both parties have moved for summary judgment on this claim, each arguing that they are entitled to judgment in their favor. (*See* Docs. 30, 31, Mots. Summ. J.).

## II. STANDARD OF REVIEW

Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249-50.

A party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

That the parties have filed cross-motions for summary judgment does not alter the Court's standard of review. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("[T]he standards upon which the court evaluates the motions for summary judgment do

6

not change simply because the parties present cross-motions."). Thus, in reviewing cross-motions for summary judgment, the Court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### III. DISCUSSION

Plaintiffs argue that the termination of their EdChoice scholarships "has deprived and continues to deprive Plaintiffs of [a] valuable property interest . . . without a meaningful opportunity to challenge the denial, and without sufficient due process protections to prevent errors." (*See* Am. Compl. at ¶ 103). To the contrary, Ross argues that (1) Plaintiffs did not have a property right in their EdChoice scholarships, and (2) even if they did, Plaintiffs' claim would still fail, as the procedures outlined in Ohio Administrative Code § 3301-11-14 afforded them adequate due process.

> Plaintiffs must establish three elements to prevail on a procedural due process claim:
>
> (1) that [they] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that [they] w[ere] deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford [them] adequate procedural rights before depriving [them] of [their] protected interest.

*Wedgewood Ltd. P'ship I v. Twp. Of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010). The parties contest only the first and third elements; they do not dispute that if a property right did exist, it was indeed deprived. (*See* Doc. 20, Resp. at 5). The Court will tailor its analysis accordingly.

### A. Property Right

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Property" is more than just a physical object; it also encompasses "the legal bundle of

7

rights recognized in that object." *Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991). While the concept of "property" has been described as "extremely broad and abstract," there are nonetheless limits to its breadth. *Id*. To be protected by the Fourteenth Amendment, a person must have more than an "abstract need or desire for" or a "unilateral expectation of" a certain benefit: "[h]e must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Stengel v. City of Columbus, Ohio*, 737 F. Supp. 1457, 1459-60 (S.D. Ohio 1988) (Graham, J.) ("A plaintiff complaining of a lack of procedural due process must have a legitimate claim of entitlement to property, rather than an abstract need, desire or unilateral expectation.").

Property rights are not created by the Constitution, but rather are grounded in "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. Thus, the specific boundaries of what qualifies as "property" are determined by state law. *See Albrecht v. Treon*, 617 F.3d 890, 895 (6th Cir. 2010) ("Ohio state law governs the definition of 'property' in Ohio."). But whether that property interest "rises to the level of a 'legitimate claim of entitlement' protected by the due process clause is determined by federal law." *Brotherton*, 923 F.2d at 481.

### 1. The Derezic Plaintiffs

Ross argues that the Derezic Plaintiffs do not have a property interest in their EdChoice scholarships as they "never actually met the eligibility criteria to receive the scholarship." (Doc. 31, Mot. Summ. J. at 16). Specifically, Ross contends that because the Derezic children "were never assigned to an eligible school building," they did not—and still do not—possess a "legitimate claim of entitlement" to an EdChoice scholarship. (Doc. 20, Resp. at 3). That the ODE granted the Derezic Plaintiffs a limited non-renewable scholarship to compensate them for

8

the late notice and confusion surrounding Euclid's reorganization should not, according to Ross, affect the analysis.

The Derezic Plaintiffs assert that they have a legitimate claim of entitlement to receive an EdChoice scholarship for two reasons: (1) at the time their EdChoice applications were submitted and reviewed, their children were assigned to attend an EdChoice-eligible school and were thus technically "eligible" for the scholarship; and (2) regardless of the ODE's latter recantation, it is uncontested that the ODE initially approved their scholarship applications and deemed them "eligible" for the EdChoice program, thus entitling them to a presumption of renewal for subsequent school years. (*See* Doc. 35, Resp. at 4).

The Court finds the Derezic Plaintiffs have a legitimate claim of entitlement to receive EdChoice program benefits. Evidence in the record demonstrates that at the time the Derezic Plaintiffs applied for the EdChoice program, their children were assigned to attend EdChoice-eligible schools. (*See* Am. Compl. at ¶ 39; Doc. 15, Ex. A, Eligible Schools List; Doc 15, Ex. D, EdChoice Calendar (establishing application deadline as 4/13/2012); Doc. 15, Ex. C, ODE E-Mail (making IRN recommendations on 4/25/2012); Doc. 30, Ex. 1, EdChoice Processing Data; Doc. 30, Ex. 2, Euclid E-Mail (parents not informed of reorganization until mid-May)). The ODE—based on the then-accurate information provided by the Derezic Plaintiffs—deemed them eligible students under Ohio Administrative Code § 3301-11-04 and awarded them EdChoice scholarships pursuant to Ohio Administrative Code § 3301-11-07. (*See* Doc. 30, Ex. 1, EdChoice Processing Data; Doc. 30, Ex. 3, Derezic Letters). These facts demonstrate that the Derezic Plaintiffs possessed more than an abstract desire for an EdChoice scholarship: at the time they applied for the EdChoice program, their children were assigned to an EdChoice-

9

eligible school, they were deemed eligible under the program, and they were awarded a scholarship pursuant to statute.

Further, Ohio Administrative Code § 3301-11-04 states that "[a] student who has received an educational choice scholarship *shall* continue to be eligible to receive scholarships in subsequent school years until the student completes grade twelve" pending certain factors are met. *See* Ohio Admin. Code § 3301-11-04(C) (emphasis added). The Court acknowledges (and generally agrees with) Ross's argument that this renewal statute is premised on the assumption that the student was eligible to participate in the program in the first place. The Court also acknowledges (and generally agrees with) Ross's contention that the EdChoice program and its enacting legislation did not intend for a student who was initially deemed eligible in error to renew their scholarship year after year without intervention. But these arguments do not affect the Court's analysis.

As Plaintiffs argue, "due process protections are triggered by a legitimate *claim* of entitlement, not on the ultimate outcome of whether the entitlement should continue." (Doc. 35, Resp. at 4); *see also* Roth, 408 U.S. at 577. At the time they applied for their scholarships, the Derezic Plaintiffs were assigned to attend EdChoice-eligible schools and were otherwise qualified for the program. The ODE deemed them eligible under § 3301-11-04, and granted them EdChoice scholarships. As students once deemed statutorily eligible for the program, the Derezic Plaintiffs had a legitimate claim of entitlement to renewal pursuant to § 3301-11-04(C). Whether the ODE was justified in revoking the Derezic Plaintiffs' eligibility or whether the ODE rightly denied the Derezic Plaintiffs' renewal applications is not at issue here. The Court is not tasked with deciding whether the Derezic Plaintiffs are ultimately entitled to a renewal of their

10

scholarships; rather, it must decide whether Plaintiffs had a legitimate claim of entitlement that warrants protection. For reasons set forth above, the Court finds that they did.

### 2. The Nosse Plaintiffs

The Nosse Plaintiffs also assert they have a property right in their EdChoice scholarships. They argue that they would have been eligible for the program if not for Euclid's confusing and—according to the Nosse Plaintiffs, unscrupulous—reorganization. They also argue that because the ODE granted them a scholarship for the 2012-2013 school year, they are entitled to a presumption of renewal and thus have a property interest in the continuation of their EdChoice scholarships. (*See generally* Doc. 30, Mot. Summ. J. at 7-10). Ross disagrees, arguing that the Nosse Plaintiffs were deemed ineligible for the program from the outset and were only granted a limited non-renewable scholarship—based on the ODE's empathy and discretion, not statutory mandates. (*See* Doc. 31, Mot. Summ. J. at 13-15).

The Court finds that unlike the Derezic Plaintiffs, the Nosse Plaintiffs do not have a legitimate claim of entitlement to continued participation in the EdChoice program and a renewal of their scholarships. At no time were the Nosse children assigned to attend EdChoice-eligible schools: not at the time their applications were submitted, not at the time the ODE reviewed their submissions, not at the time the ODE issued its decision, and at no time thereafter. (*See* Am. Compl. at ¶ 88; Doc. 15, Ex. A, Eligible Schools List; Doc. 30, Ex. 5, Nosse Letters). Thus, the Nosse Plaintiffs fail to satisfy the most important perquisite of the program, i.e., attending, or being assigned to attend, an EdChoice-eligible school. *See* Ohio Admin. Code § 3301-11-04(A). The Court cannot find that the Nosse Plaintiffs' claim of entitlement to their continued participation in a program for which they were never eligible is "legitimate."

The Nosse Plaintiffs focus much of their argument on Euclid's reorganization and the dispute over the propriety of the district's IRN assignments.[2] While Euclid's motives and its disregard of ODE recommendations is undoubtedly troubling to the Court (and should be to the ODE as well), Euclid Local School District is not a party to this action. Moreover, Plaintiffs have not brought a claim challenging the legality of Euclid's reorganization, its alleged misappropriation of IRNs, or its authority to assign students in a certain manner. The only question before the Court is whether the ODE deprived Plaintiffs of property, to which they had a legitimate claim of entitlement, without due process. The record clearly demonstrates that the Nosse Plaintiffs were ineligible for the EdChoice program before, during, and after they submitted their EdChoice applications. The Nosse Plaintiffs' belief that their children were or should have been eligible for the EdChoice program can therefore only be described as something akin to an "abstract desire" or "unilateral expectation"—not a legitimate claim of entitlement deserving of due process protection.

That the ODE granted the Nosse Plaintiffs a non-renewable EdChoice scholarship as a token of good will does not alter the Court's conclusion. The ODE's scholarship offer was not made pursuant to the Nosse Plaintiffs meeting all of the program's statutory eligibility requirements; it was an offer born of empathy.[3] (*See* Doc. 30, Ex. 4, Euclid Situation at 1). As such, the ODE made clear that the scholarship offered was finite: one year, nonrenewable. The Court acknowledges that the offer and acceptance of this one-year EdChoice scholarship may

---

[2] IRNs, or Information Retrieval Numbers, are unique 6-digit identifiers assigned to each school building in Ohio. IRNs are used for accountability purposes, as a mechanism to properly identify to which school a student's data should be attributed. When a school district reorganizes its buildings, there are certain guidelines issued by the ODE to aid districts in properly transferring or creating IRNs. In the context of this case, IRNs are important to determining which schools qualify as EdChoice-eligible, as eligibility is based on low school performance scores, which is essentially an aggregate measure of student performance.

[3] This is an important distinguishing fact between the two sets of Plaintiffs: the ODE explicitly deemed the Derezic Plaintiffs statutorily eligible and offered them an unqualified opportunity to participate fully in the program before changing its position. Conversely, the Nosse Plaintiffs were never deemed statutorily eligible or extended such an offer; the limited scholarship they received was not grounded in statute but in a discretionary exercise of good will.

12

have created a legitimate claim of entitlement to a scholarship for the 2012-2013 school year based on a mutually explicit understanding between the parties. *See Geriatrics, Inc. v. Harris*, 640 F.2d 262, 264 (10th Cir. 1981) (recognizing that a protectable property interest can be secured by statute, legal rule, or "through a mutually explicit understanding"). But the Nosse Plaintiffs do not allege that the ODE deprived them of their 2012-2013 EdChoice scholarship; they assert a property interest in their continued participation in the EdChoice program. The EdChoice scholarship that the ODE awarded, in its discretion, to the Nosse Plaintiffs was for one year and nonrenewable. Any expectation that the Nosse Plaintiffs had in renewal is unsupported by the plain language of the offer, the undisputed facts, and the evidence in the record. Such unilateral expectations do not qualify as a property interest protected by the Fourteenth Amendment.

As the Nosse Plaintiffs have failed to satisfy an essential element of their due process cause of action, the Court finds that Ross is entitled to judgment as a matter of law on their due process claim. Ross's motion for summary judgment, as it pertains to the Nosse Plaintiffs, is therefore **GRANTED**.

The only issue that remains, therefore, is whether Ross afforded the Derezic Plaintiffs adequate due process before depriving them of their EdChoice scholarships.

**B.     Due Process**

Procedural due process guarantees that "no significant deprivation of life, liberty, or property will take place until notice has been provided and the individual has a meaningful opportunity to be heard." *G.B. v. Rogers*, No. 1:08-CV-437, 2009 WL 1322451, at *8 (S.D. Ohio May 11, 2009) (Black, J.). Thus, "[t]he core of due process is the right to notice and a meaningful opportunity to be heard. *LaChance v. Erickson,* 522 U.S. 262, 266 (1998). But due

process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). As such, "[t]he amount of process due will vary according to the facts of each case." *Richards v. McDavis*, No. 2:12-CV-846, 2013 WL 5297244, at *7 (S.D. Ohio Sept. 19, 2013) (Sargus, J.).

The Supreme Court has outlined a three-part balancing test to aid courts in determining the amount of process due in any particular circumstance. The Court is instructed to weigh (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 334-35 (1976).

The parties agree on the aforementioned analytical framework, but disagree as to in whose favor the *Mathews* factors weigh. Plaintiffs argue they were entitled to more detailed notice, access to all information and material on which the ODE relied in reaching its decision, and an oral hearing in front of a neutral decision-maker. Plaintiffs assert that the cost of implementing these measures would be low and justified in light of (1) the high risk of error associated with the current procedures and (2) Plaintiffs' significant interest in their EdChoice scholarships. To the contrary, Ross argues that Plaintiffs were afforded adequate due process: They were notified of their termination, and the basis therefor, in writing. They were also provided the opportunity to request reconsideration and submit any supplemental documentation or evidence in support of their position. Ross further argues that Plaintiffs were able to access any information relied upon by the ODE through public records requests—which Plaintiffs indeed utilized. Finally, Ross argues that the expense and administrative burden associated with

14

providing an oral hearing for every individual terminated from the EdChoice program would "slow the Department's EdChoice scholarship process to a standstill." (Doc. 31, Mot. Summ. J. at 20).

In applying the *Mathews* factors to the facts of this case, the Court finds Plaintiffs were awarded sufficient due process before being deprived of their EdChoice scholarships. While receiving a proper education is undoubtedly an important interest to parents and children alike, the private interest at stake here is narrower than that. The issue is not Plaintiffs' interest in educating their children in general; it is Plaintiffs' interest in receiving $4,200 a year in government aid to subsidize their children's private schooling. As Ross argues, Plaintiffs have not been denied total access to education: their children are able to attend Euclid public schools or re-enroll in private school, albeit without government assistance. Further, the ODE's termination decision does not permanently deprive Plaintiffs of the opportunity to participate in the EdChoice program. If at some time in the future Plaintiffs' circumstances change, they can always reapply to have the ODE reconsider their eligibility status.

Concerning the second *Mathews* factor, Plaintiffs argue that this case and the entire "Euclid situation" highlight the inefficacy of the procedures in place and the high risk of erroneous deprivation resulting therefrom. But Plaintiffs do not explain how a more detailed termination letter or an oral hearing would have helped to avoid the situation that arose here. It is true the ODE's termination letter did not specifically outline the program's reconsideration procedures or present, in detail, a comprehensive analysis of Euclid's reorganization plan. But the purpose of the notice requirement is not to set forth every possible remedy available to an individual or every nuanced detail affecting an administrative decision; it only requires sufficient information to "ensure that the opportunity for a hearing is meaningful." *City of W. Covina v.*

*Perkins*, 525 U.S. 234, 241 (1999).  Here, the termination letter succinctly set forth the basis for the ODE's decision: Plaintiffs' children were not assigned to an EdChoice-eligible school for the 2012-2013 school year.  (*See id.*).  The letter also provided the EdChoice Scholarship Office's phone number and email for Plaintiffs to utilize in the event they had "questions or concerns." (*See, e.g.*, Doc. 30, Ex. 4, Derezic Letters).  Further, the allegedly insufficient notice did not cause Plaintiffs to miss any filing deadlines, did not contain any false or misleading statements concerning their ability to appeal, and did not preclude them from actually filing their reconsideration request.  To the contrary, the record demonstrates that Plaintiffs were aware of, and followed, the proper reconsideration procedures in appealing the merits of the ODE's decision.  (*See* Doc. 1, Ex. L, Reconsid. Req.).

The Court has considered Plaintiffs' argument that they deserved an oral hearing to contest Euclid's reorganization and the methods in which Euclid retained and reassigned the district's IRNs.  The Court agrees that, in many cases, oral argument is essential to due process—especially when a claimant's credibility or veracity is at issue.  *See Gray Panthers v. Schweiker*, 652 F.2d 146 (1980) ("[N]o other procedure so effectively fosters a belief that one has been dealt with fairly. . . .").  But the Court also acknowledges that when the issue involved is "sharply focused and easily documented," a "paper hearing," i.e., a decision based solely on the written arguments of the parties, may suffice.  *See Martin v. Helstad*, 699 F.2d 387, 391 (7th Cir. 1983) (citing *Eldridge*, 424 U.S. at 343); *Sw. Airlines Co. v. Transp. Sec. Admin.*, 554 F.3d 1065, 1075 (D.C. Cir. 2009) (finding paper hearing sufficient when issue did not involve credibility determination but instead matters of statutory construction, statistical methods, and the accuracy of cost information).  Here, the ODE's eligibility determination is straightforward: if the student attends, or is assigned to attend, an EdChoice-eligible school, he or she qualifies

16

for the program. Unlike many other agencies tasked with rendering eligibility and entitlement decisions, there is very little gray area associated with the ODE's EdChoice criteria. The ODE does not have to determine whether an individual is telling the truth about the cause of his or her injuries, the extent of his or her financial or medical needs, or the degree of his or her disability. Instead, the ODE renders a formulaic decision, based primarily on the applicant's address and the data reported by local school districts. *See* Ohio Admin. Code. § 3301-11-05; Ohio Rev. Code § 3310.03.

The Court finds that because of the "sharply focused and easily documented" nature of the EdChoice eligibility determination, the ODE's process of conducting a non-oral hearing on the written submissions of the parties is sufficient. Moreover, the Court finds that the majority of information Plaintiffs had hoped to introduce at the oral hearing remains irrelevant to the ODE's decision. Plaintiffs take issue with Euclid's reorganization, its disregard of the ODE's IRN recommendations, and its student assignment plans. But the Superintendent of Euclid City Schools is the official with the authority to "assign [] pupils to the proper schools and grades," not Ross. *See* Ohio Rev. Code 3319.01. Further, while the ODE made certain IRN recommendations to Euclid, they were just that: recommendations. (*See* Doc. 1, Ex. C, IRN Recs.). In the end, although Euclid did not follow the ODE's proposed course of action, it nonetheless acted "appropriately, within the parameters outlined in the ODE IRN Guidance Document." (Doc. 1, Ex. E, IRN Correspondence; *see also* Ex. F, IRN Guidance Doc.).[4] Again, determining EdChoice eligibility is formulaic, and one bound by the plain language of the Revised Code: if, and only if, a student attends or is assigned to attend an EdChoice-eligible

---

[4] To the extent Plaintiffs contend the ODE/Euclid did not comply with state law or their own regulations, the Court reiterates its previous holding: it has no jurisdiction to consider whether either the ODE or Euclid complied with state law. The only issue before the Court is whether Plaintiffs were afforded sufficient procedural safeguards as guaranteed by the Fourteenth Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (*Ex parte Young* exception does not apply to claims "against state officials on the basis of state law").

school can the student qualify for the program.  Plaintiffs do not contest that at the time they were terminated from the EdChoice program, their children were assigned to attend a non-eligible school.  Plaintiffs' discontent with Euclid's redistricting is irrelevant to the ODE's ultimate eligibility determination and therefore cannot serve as a basis for their due process claim.  *See Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4 (2003) ("[D]ue process does not require the opportunity to prove a fact that is not material to the State's statutory scheme."); *Doe v. Petro*, No. 1:05-CV-125, 2005 WL 1038846, at *2 (S.D. Ohio May 3, 2005), *as amended* (Oct. 24, 2006) (Beckwith, J.) ("Plaintiffs are not entitled to a due process hearing to establish a fact not relevant to the statutory scheme.").

Finally, the Court considers the ODE's interest, specifically the fiscal and administrative burdens that additional procedural safeguards would require.  Plaintiffs argue that the ODE's burden to provide an oral hearing to those terminated from the EdChoice program would be "minimal" because "a relatively low number of applicants are denied." (Doc. 30, Mot. Summ, J. at 24).  In response, Ross argues that this "low number" amounted to nearly 400 denied applicants for the 2012-2013 school year alone.  Providing oral hearings for each of these students would, according to Ross, significantly burden the ODE in terms of personnel, funding, and time.  The Court finds that the ODE has a significant interest in administering the EdChoice program in a costly and efficient manner.  Providing every applicant who is denied or terminated from the program an oral hearing would undoubtedly hinder this interest.  Further, as discussed above, Plaintiffs have not explained how oral arguments would have mitigated or prevented any errors or otherwise aided the ODE in its decision-making process.  Accordingly, the Court finds that the ODE's interest in efficiently administering the EdChoice program weighs heavily against the minimal benefits of providing an oral hearing to denied/terminated applicants.

In conclusion, after considering all of the *Mathews* factors, i.e., Plaintiffs' private interest in participating in the EdChoice program, the risk of erroneous deprivation posed by the ODE's current procedures, the value of additional or substitute safeguards, the ODE's interest in effectively administering the EdChoice program, and the fiscal and administrative burdens associated with imposing additional due process protections, the Court finds the ODE afforded Plaintiffs sufficient due process before terminating them from the EdChoice program.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that no genuine issues of fact remain and that Ross is entitled to judgment as a matter of law on all of Plaintiffs' claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Accordingly, the Court **GRANTS** Dr. Richard A. Ross's Motion for Summary Judgment (Doc. 31) and **DENIES** Plaintiffs' Motion for Summary Judgment (Doc. 30).

The Clerk shall remove Documents 30 and 31 from the Court's pending motions list.

The Court shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**